**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| MELISSA and BENJAMIN VERMETTE<br>*Plaintiffs*<br><br>v.<br><br>ALAN RICE; ALEXANDER CHARLAND;<br>and MAARECO, LLC d/b/a KELLER<br>WILLIAMS REALTY METROPOLITAN<br>*Defendants* | Case No. |

**COMPLAINT AND JURY DEMAND**

Plaintiffs Melissa and Benjamin Vermette (the "Vermettes") through counsel bring this diversity action alleging that they suffered property injury and emotional distress because of the above defendants' fraud and fiduciary abuse, specifically alleging as follows:

**PRELIMINARY STATEMENT**

This action arises from the greed-inspired exploitation by an established realty firm of their clients, the Vermette family. Defendant Keller Williams Realty Metropolitan ("KW Metro") manipulated standard form contracts and concealed material facts to exploit their clients. KW Metro concealed from the Vermettes (1) multiple buyer defaults, (2) bounced escrow checks, and (3) clear indicators of financial risk and potential § 1344 bank fraud. By stripping the Vermettes of their contractual protections, KW Metro forced a doomed transaction forward because of its own self-seeking. When the deal inevitably collapsed, KW Metro's concealment left the Vermettes blindsided, without their possessions, facing mounting costs, and indefinitely homeless with young children. KWR Metro's denial of responsibility invoked a liquidated damages clause nullified by its own escrow abuse, while the firm pocketed an undisclosed referral fee. KWR Metro's conduct reflects unrepentant, habitual abuse and predatory practices by an established firm against its own clients. Defendants should be held accountable for the harm they caused to the Vermettes.

## PARTIES

1. Plaintiffs Melissa and Benjamin Vermette (the "Vermettes" or "sellers") are individuals who reside in South Carolina, after have moved from New Hampshire on July 9, 2025.

2. Defendant Alan Rice ("Rice") is an individual who resides in New Hampshire and the managing broker of KW Metro. *See* RSA 331-A:2.

3. Defendant Alexander Charland ("Charland" or "seller agent") is an individual who resides in New Hampshire and was the sellers agent designated by Rice for KW Metro. *Id*.

4. Defendant MAARECO, LLC d/b/a "Keller Williams Realty Metropolitan" ("KW Metro") is a company organized under the laws of New Hampshire. It is a "firm" and was, at all relevant times, the sellers agent. *Id*.

## JURISDICTION

5. The Court has jurisdiction over this action under 28 U.S.C. §1332(a)(2), as the action is between citizens of South Carolina and citizens of New Hampshire, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. The Court has jurisdiction over Defendants, as their domicile is in New Hampshire.

## FACTS

**I. KW METRO DESIGNATES CHARLAND AS VERMETTES' AGENT**

7. On April 4, 2025, the Vermettes engaged KW Metro as agent to sell their home, executing a standard form Listing Agreement ("Listing Agreement," attached as EXHIBIT 1).

8. Under paragraph 4 of the Lising Agreement, KW Metro designated Charland to be the Vermettes' sellers agent [1] and agreed that Charland owes the Vermettes "fiduciary duties of loyalty, obedience, disclosure, confidentiality, reasonable care, diligence and accounting."

---

[1] *See* RSA 331-A:25-e (agent under designation "shall not" limit liability of principal broker for designee's breaches).

2

9. KW Metro was to receive 3% of the contract price for the Vermettes' home.

## II. KW METRO MISREPRESENTS PROOF OF FUNDS TO INDUCE VERMETTES

10. On June 14, 2025, Charland told the Vermettes that the Zagarellas (the "buyers") had cash on hand to close "tomorrow."

11. Charland informed the Vermettes that the buyers agreed to close by July 8.

12. On June 17, Charland advised the Vermettes to accept the buyers' offer based on his review of buyers' proof of funds; relying on Charland's advice, the Vermettes executed the Purchase and Sale Agreement, effective June 17 (the "Agreement," attached as EXHIBIT 2).

13. Unbeknownst to the Vermettes, since March, the buyers were facing an eviction proceeding arising from their failure to pay rent when due.

14. Under paragraph 2 of the Agreement, the buyers agreed to deliver to KW Metro's escrow agent an earnest money deposit of $10,000 by June 19.

15. In the event the buyers fail to so deliver the deposit, the Vermettes had the contractual right to terminate the Agreement.

16. Paragraph 19 waives the financing contingency and states "proof of funds attached"; but the proof of funds that was shown by Charland to the Vermettes (*i.e.*, a screen shot of a bank account) was omitted from the executed Agreement. *See* Ex. 2.

17. After execution, KW Metro took responsibility for collecting the earnest money deposit and shepherding the transaction toward closing as the sellers agent.

## III. KW METRO MISREPRESENTS DEFAULTS TO INDUCE THE VERMETTES

18. Unbeknownst to the Vermettes, the buyers defaulted on their deposit obligation and supplied shifting excuses—*e.g.*, they would do it "on their break" or "in the morning."

19. Charland misrepresented the situation, falsely reassuring the Vermettes that the buyers were performing.

20. By June 23, the buyers had not funded the deposit, so Charland executed an addendum extending the deadline to June 24, inducing the Vermettes' agreement as follows:

> The buyer's agent and buyer had a hard time using the digital payment method for deposit, and now that they have tried too many times it locked him out… no issues or anything to worry about this is for clerical reasons.

21. At this time, Mrs. Vermette asked Charland if they should be concerned.

22. Charland said 'everything is fine,' despite the indicators (concealed) to the contrary.

### IV. KW METRO CONCEALS BOUNCED CHECK, STRIPS CLIENTS OF RIGHTS

23. On June 24, Charland told the Vermettes he received the "deposit this afternoon… in good shape now"—withholding the fact that the check was not a certified bank check.

24. On June 27, the escrow check bounced and the buyers were in default, activating the Vermettes' right to terminate the Agreement.

25. KW Metro concealed the default from his clients to deceptively keep the deal alive.

26. *For the ensuing two weeks, KWR Realty acted as though the the buyers were performing and the deposit was received—thereby deceiving the Vermettes.*

### V. KW METRO CONCEALS ADDITIONAL PAYMENT FAILURES

27. On June 29, buyers agent told Charland that the buyers were "short $18" and would be bringing a *bank check* on June 30. Charland concealed these facially concerning representations.

28. On July 1, buyers agent asked Charland if the check had been received; it had not; Charland did not disclose this.

29. *The Vermettes, forced to rely on KW Metro, were led to believe (still) that the deposit was successfully made on June 24.*

30. On July 2 - 3, buyers agent told Charland that the buyers had accidentally taken the check to the wrong office. The buyers then called Charland directly, offering new excuses—*e.g.*, a family emergency. This was not disclosed to the Vermettes.

31. Later, on July 3, Charland received another check—Charland did not disclose that this was a personal check *or that another personal check had bounced a week earlier.*

32. The title company ("Title") informed Charland that the check, because a personal check, would not clear until July 9—after the set closing date.

## VI. JULY 7: KW METRO MISREPRESENTS WIRE AMID COLLAPSE

33. Title then instructed Charland that the buyers needed to wire funds.

34. Charland falsely explained the pivot to wire to the Vermettes as though the situation were under control; he did not verify the buyers' routing and account information as required under the Agreement, nor did he disclose that the pivot to wire was to *accommodate buyers' default*.

35. On July 7, Charland told the Vermettes that the buyers were wiring the funds "right now" and "waiting for confirmation."

36. At the walk-through, the buyer insisted the wire had been sent. Title confirmed otherwise, and buyer changed her story several times; Charland withheld this from the Vermettes.

37. On July 7, Title informed Charland that the buyers had run down the closing clock; Charland simply told the Vermettes that closing had to be postponed until the next morning.

38. On July 7, Charland finally disclosed to Mrs. Vermette that the first deposit check was personal and had bounced, she immediately voiced concerns of bank fraud, to which KW Metro replied: 'as long as you get paid for the house, you're fine, they won't come after you.'

## VII. BUYERS DISAPPEAR WITH NO FUNDS; KW METRO ABANDONS CLIENTS

39. The next morning, the buyers signed documents but again failed to produce funds.

40. Charland did not show up at the closing and was unavailable all day; *no one at KW Metro was at the closing to represent the interests of the Vermettes, their clients*, despite KW Metro's internal narrative that it made "dozens of calls, texts, emails, to [buyers agent] and title."

41. The buyers had abandoned the transaction. KW Metro failed to secure the earnest money, failed to verify and misrepresented buyers' financing, concealed objective indicators of financial risk and buyers' apparent fraud, and had relayed false assurances throughout the process.

## VIII.    KW REALTY CONTINUES MISREPRESENTATIONS, REFUSES RELIEF

42. On July 9, Mrs. Vermette sought clarification about the $10,000—second personal check—at which time KW Metro told her that it "bounced against the [KW Metro's] account."

43. KW falsely stated to the Vermettes that because the checks had bounced, *relief must be sought only from the buyers by the Vermettes.*

44. Title informed the Vermettes of the conduct of the buyers that KW Metro withheld.

45. On July 11, KW Metro's managing broker, Defendant Rice, spoke with Mrs. Vermette on the phone and stated to her 'personal checks are used all the time.'

46. On July 25, after 'internal review,' KW realty refused the Vermettes' relief.

47. While acknowledging its own responsibility, KW Realty justified the refusal by stating KW Metro is not "exclusively responsible for the failure of your property to transfer." Rice promised that his attorney would reach out—the Vermettes had to follow up several times.

48. Around July 28, Charland received a referral fee—half of commissions—on the Vermettes purchase of their South Carolina home, without disclosing this fact to the Vermettes.

## IX.    DAMAGES

49. As a direct result of KW Metro's misconduct, the Vermettes suffered substantial financial and emotional harm.

50. The delayed New Hampshire closing forced the Vermettes to delay closing on their home in South Carolina, forcing them to relinquish a $10,000 credit and incur additional thousands in rent in South Carolina and mortgage payments in New Hampshire.

51. KW Reality refused relief, including refusing to furnish the Vermettes with their $10,000 under the contract representing the earnest money deposit.

52. The Vermettes were forced to incur additional costs, including $14,400 in bridge-loan costs; $7,044.11 in penalties for early withdrawal from Mrs. Vermette's deferred compensation package; $1,500 in storage and delivery of belongings which were delivered to Georgia because of the South Carolina closing delay; at least $1,410.69 in hotel expenses in New Hampshire and South Carolina; at least $1,697.87 for food, as the Vermettes were without appliances; and $26,800 in depleted deferred compensation.

53. The Vermettes suffered emotional distress and loss of consortium, including chronic sleep issues, anxiety, and severe depressive disorder resulting from (1) effective homelessness with young kids and related trauma and (2) callous betrayal by their fiduciary.

**COUNT I**
**BREACH OF FIDUCIARY DUTY**
| RSA 331-A:25-a |
*against all Defendants*

54. The Vermettes incorporate the preceding paragraphs as though restated below.

55. Under RSA 331-A:25-a, as licensed real-estate agents, Defendants owed to the Vermettes fiduciary duties of loyalty, disclosure, reasonable care, diligence, and obedience.

56. Defendants breached those duties by:

   a. prioritizing their own financial interests over the interests of the Vermettes;
   b. misrepresenting that the earnest money deposit was received;
   c. relaying false assurances about wire transfers;
   d. depriving the Vermettes of the right to terminate the Agreement on buyers' default;
   e. failing to attend closing or represent their clients' interests; and
   f. prioritizing the transaction above their clients' safety and interests.

57. The Vermettes reasonably relied on their fiduciaries, consistent with RSA 331-A:25-a and the Listing Agreement.

58. The aforesaid damages suffered by the Vermettes directly flow from the breaches.

## COUNT II
## NEGLIGENCE *PER SE*
*against all defendants*

59. The Vermettes incorporate the preceding paragraphs as though restated below.

60. RSA 331-A imposes continuing duties on Defendants as licensed brokers.

### Breach Category #1

61. Under RSA 331-A:25-b(I)(b)(1), Defendants were obligated to promote the interests of the sellers by seeking a sale at a price and terms acceptable to the sellers.

62. Defendants breached this duty when they failed to exercise reasonable care in verifying the buyers' financing and neglected the obvious risks after the first bounced check.

63. Defendants breached this duty when they concealed buyers' default and thereby deprived the Vermettes of their contractual right to terminate the Agreement upon said default.

### Breach Category #2

64. Under RSA 331-A:25-b(I)(b)(3), Defendants were obligated to account in a timely manner and upon termination of the brokerage agreement for all money and property received in which the seller had or may have had an interest.

65. Defendants committed independent breaches of this statutory duty when:
    a. Charland represented that buyers had cash on hand (6/14/2025);
    b. Charland represented that he had reviewed buyers' proof of funds (6/17/2025);
    c. Charland represented "proof of funds attached" but no proof of funds was attached (6/17/2025);
    d. Charland told "we just received the escrow deposit…" without disclosing that the check was personal check (6/24/2025)
    e. Charland failed to disclose deposit check bounced (6/27/2025);

8

    f.   Defendants concealed fact of bounced check (6/27-7/7/2025);

    g.   Charland represented that buyers were wiring the funds "right now" (7/7/2025);

    h.   Charland represented that buyer was "waiting for money to re-release into his account by noon" (7/7/2025); and

    i.   Charland concealed that second check was personal check.

66. The above conduct also constitutes independent violations of Defendants' duties set forth in RSA-A:26(IV) and (V), respectively.

67. These violations constitute negligence *per se.*

68. The aforesaid damages suffered by the Vermettes directly flow from the breaches.

## COUNT III
### FRAUDULENT CONCEALMENT
*against all Defendants*

69. The Vermettes incorporate the preceding paragraphs as though restated below.

70. "'Fraudulent concealment occurs when one party to a transaction by concealment or other action intentionally prevents the other from acquiring material information.'" *Ingram* v. *Drouin*, 167 N.H. 416, 422 (2015) (quoting Restat (2d) Torts § 550 (1977)).

71. The Vermettes and Charland were each party to the Purchase and Sale Agreement.

72. The buyers' impaired financial position and apparent inability to fund the deal was a "material fact," as its concealment influenced the decision-making process of the Vermettes.

73. Defendants knowingly concealed this on the following occasions:

    a.   Charland told "we just received the escrow deposit…" without disclosing that the check was personal check (6/24/2025)

    b.   Charland failed to disclose deposit check bounced (6/27/2025);

    c.   Defendants concealed fact of bounced check (6/27-7/7/2025);

    d.   Charland represented that buyers were wiring the funds "right now" (7/7/2025);

    e.   Charland represented that buyer was "waiting for money to re-release into his account by noon" (7/7/2025); and

    f.   Charland concealed that second check was personal check.

74. Defendants had a duty to disclose under RSA 331-A:25-a.

75. Defendants intentionally induced the Vermettes' to reliance on the concealment to advance the deal, evidenced by Defendants' nondisclosure of default beginning on June 27, 2025.

76. Plaintiffs reasonably relied by their being unwittingly deprived of their contractual right to terminate and by staying in the agreement against their interests.

77. The aforesaid damages suffered by the Vermettes directly flow from the breaches.

## COUNT IV
## EQUITABLE ESTOPPEL
*against all Defendants*

78. The Vermettes incorporate the preceding paragraphs as though restated below.

79. Defendants concealed from the Vermettes the material fact, with knowledge of the fact and its materiality, of the risk buyers' financial disability and apparent fraud.

80. The Vermettes were kept ignorant of said fact by Defendants.

81. As aforesaid, Defendants' concealment of said fact was intentional.

82. As aforesaid, the Vermettes were induced to rely upon the concealment.

83. As aforesaid, the Vermettes were injured by their reliance.

84. Based on the foregoing, Defendants should be equitably estopped from the defense or damages limitation of liquidated damages arising from the Purchase and Sale Agreement.

## COUNT V
## RESPONDEAT SUPERIOR
| RSA 331-A:25-e (IV) |
*against Defendants KW Metro and Rice*

85. The Vermettes incorporate the preceding paragraphs as though restated below.

86. Rice was the "principal broker" within the meaning of RSA 331-A:25-e (IV), and KW Metro was the appointing agent within the meaning of same.

87. Under RSA 331-A:25-e, KW Metro's appointment of Charland as a designated sellers agent does not "limit the liability or responsibility of the appointing agent and principal broker for breaches of duty by the designated agent."

88. Charland acted within the scope of his agency as a designated agent appointed by KW Metro within the meaning of RSA 331-A:25-e (IV).

89. KW Metro and Rice are, respectively, vicariously liable for all Charland's torts.

90. The aforesaid damages suffered by the Vermettes directly flow from breaches.

## COUNT VI
## UNJUST ENRICHMENT
*against Defendant Charland*

91. The Vermettes incorporate the preceding paragraphs as though restated below.

92. Charland was enriched at the Vermettes' expense when he accepted a "referral fee" arising from the Vermettes' purchase of their South Carolina home.

93. Charland did not disclose to the Vermettes the fact of this referral, as is required by RSA 331-A.

94. In light of Charland's related tortious acts and his failure to disclose the referral fee, it would be unconscionable for Charland to retain said fee.

## COUNT VII
## UNFAIR BUSINESS ACTS
| RSA 358-A:10 |
*against all Defendants*

95. The Vermettes incorporate the preceding paragraphs as though restated below.

96. RSA 358-A:2 makes it unlawful for "any person" to use "any unfair or deceptive act or practice in the conduct of any trade or commerce" in New Hampshire.

97. Defendants were engaged in the trade of a real estate broker in New Hampshire.

11

Unfair and Deceptive Scheme #1

98.  Defendants engaged in a calculated scheme to abuse standard form contracts to exploit their clients, to induce the Vermettes into agreements based on false pretenses, to reap unjust enrichment, and to justify a bad faith refusal of relief despite acknowledged responsibility.

99.  This scheme entailed the following:

   a. Charland omitted proof of funds from the Purchase and Sale Agreement, despite representing under Paragraph 19 "proof of funds attached."
   b. Charland induced the Vermettes into the June 24 addendum based on the false pretense that 'buyers were having trouble with the payment link';
   c. Defendants concealed from the Vermettes the buyers' default in order to deprive the Vermettes of their contractual right to terminate;
   d. Defendants relied in bad faith on the liquidated damages clause in the Purchase and Sale Agreement to justify their refusal to provide relief despite acknowledged responsibility; and
   e. Despite willful fiduciary abuse, Charland accepted a "referral fee" worth thousands of dollars on the Vermettes' South Carolina home, without disclosing same.

100. Defendants' scheme was unfair and deceptive, willful and knowing.

Unfair and Deceptive Scheme #2

101. Defendants engaged in a calculated scheme to recklessly advance a high-risk real estate transaction by deceptively and improperly offloading risk onto the unwitting Vermettes.

102. This entailed the following:

   a. Charland told "we just received the escrow deposit…" without disclosing that the check was personal check (6/24/2025)
   b. Charland failed to disclose deposit check bounced (6/27/2025);
   c. Defendants concealed fact of bounced check (6/27-7/7/2025);
   d. Charland represented that buyers were wiring the funds "right now" (7/7/2025);
   e. Charland represented that buyer was "waiting for money to re-release into his account by noon" (7/7/2025); and
   f. Charland concealed that second check was personal check.

103. Defendants' scheme was unfair and deceptive, willful and knowing.

104. The aforesaid damages suffered by the Vermettes directly flow from the breaches.

105. The Vermettes are entitled to enhanced damages and attorneys' fees.

## COUNT VIII
## PUNITIVE DAMAGES
| South Carolina Common Law |
*against all Defendants*

106. The Vermettes incorporate the preceding paragraphs as though restated below.

107. "The purposes of punitive damages are to punish the wrongdoer and deter the wrongdoer and others from engaging in similar reckless, willful, wanton, or malicious conduct in the future." *Clark* v. *Cantrell*, 339 S.C. 369, 379 529 S.E.2d 528 (2000).

108. Defendants showed willfulness and wantonness in their deliberate indifference to their fiduciary and professional obligations to their clients, the Vermettes.

109. Defendants showed willfulness and wantonness in their deliberate indifference to the financial risks they deceptively and improperly imposed on their unwitting clients.

110. Defendants showed willfulness and malice in their knowing concealment of buyers' default, bounced checks, and apparent attempted bank fraud.

111. Defendants showed malice when they—knowing their responsibility for the extreme financial harm and personal hardship resulting to the Vermettes—refused to provide any relief based on a bad faith denial based on a damages clause nullified by its own escrow abuse.

112. Defendants showed malice when they accepted, without disclosing to the Vermettes, a referral fee on the Vermettes' purchase of their new home in South Carolina.

113. This conduct was intentional, malicious, reckless, and exhibited a conscious disregard for the Vermettes' safety, financial interests, and legal rights.

114. Defendants' conduct evinces knowing violation of statutory duties of their trade.

115. Defendants' conduct is so egregious as to merit sanction to deter such future fiduciary abuse of homebuyers, home sellers, and families.

116. Plaintiffs are entitled to enhanced compensatory damages, including punitive damages, in an amount to be determined by the trier of fact.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Melissa and Benjamin Vermette request that the Court enter judgment in their favor and against Defendants Alan Rice, Alecander Charland, and MAARECO, LLC, and award the following relief:

A. Compensatory Damages, in an amount to be proven at trial;

B. Statutory damages, enhanced damages, and attorney's fees under RSA 358-A:10, for Defendants' unfair and deceptive acts and practices in trade or commerce;

C. Rescissory, reliance, and special damages arising from Defendants' fraudulent concealment, negligent misrepresentation, and breach of fiduciary duty;

D. Punitive or enhanced tort damages under the substantive law of South Carolina for Defendants' intentional, malicious, reckless, and wanton conduct;

E. Pre-judgment and post-judgment interest at the maximum rates permitted by law; and

F. Such other and further relief as this Court deems just, proper, and equitable under the circumstances.

Respectfully submitted,

MELISSA & BENJAMIN VERMETTE
by their attorney,

Dated: December 5, 2025

/s/ Joseph Prive
Joseph Prive (Bar No. 274780)
NAVY YARD LAW
P.O. Box 290056
Charlestown, MA 02129
603-493-3724
jprive@navyyardlaw.com